IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHERWYN D. FREEMAN, JR.,          :          CIVIL ACTION NO. **3:CV-04-1546**
                                  :
                Plaintiff         :
                                  :          (Judge Munley)
                                  :
        v.                        :          (Magistrate Judge Blewitt)
                                  :
CLEMENTE FRIMPONG,                :
                                  :
                Defendant         :

**REPORT AND RECOMMENDATION**

## I. Background.

The Plaintiff, Sherwyn D. Freeman, Jr., an inmate at the United States Penitentiary at Allenwood ("USP-Allenwood"), Pennsylvania, filed this *Bivens*[1] action, *pro se,* pursuant to 28 U.S.C. § 1331, on July 16, 2004, naming as Defendants two (2) individuals employed by the Federal Bureau of Prisons ("BOP") at USP-Allenwood, namely Physician's Assistant ("PA") Diane Inch and PA Clemente Frimpong. (Doc. 1, pp. 1-2). Plaintiff claimed that he did not receive proper medical care at the prison for his serious ear infection and requested several million dollars in damages, as well as for the Court to commute his remaining prison term. Defendant Inch has been dismissed from this case. This case is now proceeding on the Eighth Amendment claim of denial of proper medical care against only Defendant Frimpong. This Court has jurisdiction over Plaintiff's *Bivens*[2]

---

[1]*Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999 (1971).

[2]The District Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 to entertain an action brought to redress alleged federal constitutional or statutory violations by a

action under 28 U.S.C. § 1331.

After initial screening, we found that Plaintiff had sufficiently stated an Eighth Amendment claim of denial of proper medical care as against both Defendants.[3]

On July 30, 2004, we issued an Order directing service of the Plaintiff's Complaint on the Defendants. (Doc. 6). The Defendants were then served, and we granted them an extension of time to respond to the Complaint. (Doc. 22). On December 3, 2004, the Defendants filed a joint Motion to Dismiss or for Summary Judgment. (Doc. 30). The Defendants' Motion was ripe for disposition, and on March 16, 2005 we issued a Report and Recommendation recommending as follows:

that the Defendants' Motion to Dismiss the Complaint (Doc. 30) be granted based

_____

federal actor under *Bivens, supra*. Pursuant to *Bivens*, "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." *Butz v. Economou*, 438 U.S. 478, 504 (1978). A *Bivens*-style civil rights claim is the federal equivalent of an action brought pursuant to 42 U.S.C. § 1983 and the same legal principles have been held to apply. *See, Paton v. LaPrade*, 524 F.2d 862, 871 (3d Cir. 1975); *Veteto v. Miller*, 829 F.Supp. 1486, 1492 (M.D. Pa. 1992); *Young v. Keohane*, 809 F.Supp. 1185, 1200 n. 16 (M.D. Pa. 1992). In order to state an actionable *Bivens* claim, a plaintiff must allege that a person has deprived him of a federal right, and that the person who caused the deprivation acted under color of federal law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Young v. Keohane*, 809 F.Supp. 1185, 1199 (M.D. Pa. 1992). Additionally, a defendant's conduct must have a close causal connection to the plaintiff's injury in order for liability to attach. *Martinez v. California*, 444 U.S. 277, 285 (1980).


[3] Plaintiff alleged that he was not properly treated to adequate medical care for his right ear infection in early January 2004, and that the Defendants were aware of his condition and acted in deliberate indifference to his medical needs, including the failure to treat his infection for over four (4) days which caused him to permanently lose his hearing in the ear. (Doc. 1, p. 2 & attached handwritten pages 1-3).

on the statutory immunity of Defendant Inch, as a PHS officer, and for failure to exhaust administrative remedies with respect to the Plaintiff's Eighth Amendment claim against Defendant Frimpong.  (Doc. 49).

After Plaintiff's objection to our Report and Recommendation, the District Court issued a Memorandum and Order on May 16, 2005,  granting Defendants' Motion to Dismiss Defendant Inch and denying Defendants' Motion as to Defendant Frimpong. (Doc. 53).  On May 26, 2005, Defendant Frimpong filed a Motion for Reconsideration regarding the District Court's May 16, 2005 Order.  (Doc. 61).   On June 2, 2005, the District Court denied Defendant's Motion for Reconsideration.  (Doc. 65).

The case was remanded to us, and the remaining Defendant (Frimpong) was directed to file an answer to Plaintiff's Complaint.  (Doc. 56).  On June 3, 2005, Defendant Frimpong filed a second Motion for Summary Judgment and a support Brief. (Docs. 66 & 67).  Defendant contended that his second Summary Judgment Motion raised a qualified immunity defense and that this defense was not previously ruled upon by the Court.  Plaintiff responded to Defendant's Motion by filing a Motion to Disallow Defendant from filing a second summary judgment motion.  (Doc. 77).  In August 2005, we issued an Order and denied Plaintiff's Motion to Disallow Defendant Frimpong's second Summary Judgment Motion.  We also ordered discovery to be stayed until the Court ruled upon the Defendant's second Summary Judgment Motion based on qualified immunity.

On October 21, 2005, we issued a Report and Recommendation (Doc. 104) and recommended that Defendant Frimpong's Motion for Summary Judgment (Doc. 67), wherein he sought to be shielded on the basis of qualified immunity with respect to Plaintiff's Eighth Amendment claim, be denied.  On January 17, 2006, the District Court denied Defendant

3

Frimpong's Summary Judgment Motion.  (Doc. 106).

Discovery then ensued, including the deposition of Plaintiff on February 16, 2006.  After the discovery time period elapsed, Defendant filed a Motion for Summary Judgment on June 21, 2006. **(Doc. 158)**.  Defendant filed his support Brief with attached exhibits on July 6, 2006.  (Doc. 166). Defendant also filed a Statement of Facts ("SMF") on July 10, 2006. (Doc. 169).  On July 13, 2006, Plaintiff filed an Amended Brief in opposition to Defendant's Summary Judgment Motion, and on July 19, 2006, he filed an Amended Statement of Facts.  (Docs. 172, 175).  Plaintiff requests that the Court also consider his initial Statement of Material Facts and opposition Brief which he filed with respect to Defendants' original Motion to Dismiss, or for Summary Judgment.  We shall consider Plaintiff's initial filings in opposition to Defendants' prior Motion.  (Docs. 38 & 39).[4] Defendant's Summary Judgment Motion is now ripe for disposition.[5]

## II.  Motion for Summary Judgment.

A motion for summary judgment may not be granted unless the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56.  The court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact.  Fed.R.Civ.P. 56(c).  An issue of fact is

---

[4]The Plaintiff filed his original opposition Brief with his attached Declaration and his Statement of Facts and Exhibits on December 29, 2004.  (Docs. 38 & 39).  To the extent that Plaintiff's prior stated filings relate to former Defendant Inch, we shall not consider them for present purposes since this Defendant has been dismissed from this case.

[5]This case was assigned to the undersigned for pre-trial matters.

"'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Childers v. Joseph*, 842 F.2d 689, 693-694 (3d Cir. 1988) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

The burden of proving that there is no genuine issue of material fact is initially upon the movant. *Forms, Inc. v. American Standard, Inc.*, 546 F. Supp. 314, 320 (E.D. Pa. 1982), *aff'd mem*. 725 F.2d 667 (3d Cir. 1983). Upon such a showing, the burden shifts to the nonmoving party. *Id*. The nonmoving party is required to go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories and admissions on file" designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir. 1988). In doing so, the court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id*., *quoting Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir. 1985), *cert. denied*, 474 U.S. 1010 (1985); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976) *cert. denied*, 429 U.S. 1038 (1977).

In examining a motion for summary judgment, the court does not resolve the questions of disputed facts, but simply decides whether there is a genuine issue of fact which must be resolved at trial or whether the evidence is so one-sided that one party must prevail as a matter of law. *Groff v. Continental Insurance Co.*, 741 F.Supp. 541 (E.D. Pa. 1990). "Where factual controversies exist, disputes over material facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Metro Transportation Co. v. North Star*

5

*Reinsurance Co.*, 912 F.2d 672, 678 (3d Cir. 1990), *reh. den.*

## III. Material Facts.

Initially, we repeat the material facts of this case as stated in our October 21, 2005 Report

and Recommendation (Doc. 104, pp. 5-8), as follows:[6]

> Both parties have submitted exhibits in support of their positions.
> Plaintiff has submitted his affidavit and that of inmate Hill, his cellmate
> during the incident at issue.  (Doc. 38, Ex. 1 & Doc. 52, Ex. 1).  Plaintiff also
> attached copies of his medical records and administrative remedy requests to
> his Statement of Facts, Doc. 39.  Based on the Plaintiff's Complaint and
> Declaration (Doc. 1 & Doc. 38, Ex. 1, p. 3, ¶ 11.), we find that Frimpong
> was acting within the scope of his employment with the BOP with
> respect to Plaintiff's claims against him in his pleadings, *i.e.*, in his capacity
> as a prison P.A. he denied Plaintiff medical care for his ear infection on
> January 3, 2004.  Specifically, Plaintiff avers  that he "made Frimpong,
> and my cellmate James Hill made Frimpong visually and verbally aware
> that I had an ear infection and pus leaking from my right ear on
> January 3, 2004."  Plaintiff further avers as follows:

>> 12.  Frimpong stated to me that there was nothing he could
>> do because he was only passing out pill-line medicine.
>> An argument ensued between me, my cellmate James Hill,
>> and Frimpong regarding his refusal to give me medical
>> attention.  Hill and I even physically extended our arms
>> through the cell door wicket so that Frimpong could not
>> close or relock the wicket after he gave us our medicine
>> that evening.

>> 12.  I underwent a hearing test on February 13, 2004.  During
>> the exam I did not hear any sounds in my right ear and I
>> stated this fact to the audiologist.  I did hear sounds with
>> my left hear and stated this to the audiologist.  I did hear
>> the audiologist talking to me in a one-on-one situation perfectly

---

[6]We repeat our prior Report and Recommendation since, as stated above, Plaintiff is
largely relying upon his previous filings with respect to his opposition to Defendant's current
Summary Judgment Motion.

fine because my left ear works perfectly fine.
(*Id.*, ¶ 12.).[7]

Plaintiff also submitted the Affidavit of inmate Hill in which he avers that he was Plaintiff's cellmate during relevant time of this case and that he witnessed Plaintiff complain to Defendant that Plaintiff had an ear infection and Plaintiff pleaded with him for medical attention. (Doc. 52, Ex. 1). Hill further avers that he witnessed Defendant "refuse to offer and/or provide medical attention to Freeman throughout the duration of this incident." (*Id.*, p. 1, ¶ 5.). Hill also states that Plaintiff did not refuse to be handcuffed and did not refuse medical treatment from any staff. (*Id.*, p. 2). Hill states that he and Plaintiff extended their arms through the cell door when Defendant was delivering medicine to Plaintiff to prevent Defendant from closing the door, in protest of Defendant's refusal to provide Plaintiff with medical attention for his ear. (*Id.*).

Plaintiff's evidence also reveals that Defendant Frimpong was on duty on January 3, 2004 and that he delivered medicine to the SHU inmates on this day as part of his duties. This fact is not disputed. (Doc. 38, Att. 7 & Doc. 80, ¶ 1.). There is also no dispute that Defendant Frimpong did not treat Plaintiff on January 3, 2004 for an ear infection. Defendant avers that he does not recall speaking with Plaintiff on this day but states that if Plaintiff did complain about an infectious discharge from his ear, he [ Defendant ] would have provided immediate medical attention. (Doc. 80, Ex. 1, pp. 1-2). Plaintiff's medical records submitted by both parties also reveal that Plaintiff was not treated on January 3, 2004 for an ear infection. The medical records show that Plaintiff complained about an ear ache on January 5, 2004, but that he refused to come out for an exam. He was also uncooperative on January 6, 2004, when he complained of decrease hearing. Ear drops and Amoxicillin were prescribed on January 6, 2004 for Plaintiff's ear ache. (Doc. 80, Ex. 2, p. 7).

Plaintiff also received a hearing test on February 3, 2004 by an audiologist, and he claimed he could not hear anything in his right

---

[7]Plaintiff's Declaration contains two paragraphs numbered "12." (Doc. 38, Ex. 1). We quote both of them above.

ear despite the audiologist's finding that Plaintiff could hear her perfectly in a one-on-one situation and while he was wearing the ear phones without amplification.  Plaintiff also stated that he heard nothing when his left ear was tested.[8]  The audiology exam was read as inconsistent, but Plaintiff was found to able to hear different sounds. However, as stated, Plaintiff would not admit to being able to hear sounds.  (*Id.*, pp. 4, 9).  The audiologist also concluded that, since the equipment was properly working, Plaintiff was misrepresenting his hearing loss.  (*Id.*).  In his affidavit, Plaintiff avers that he told the audiologist that he did not hear sounds in his right ear and that he did hear sounds with his left ear.  He said he could hear the audiologist in a one-on-one situation since his left ear works "perfectly fine."  (Doc. 38, Ex. 1, p. 3).

We now consider Defendant's current SMF and Plaintiff's Amended SMF.  (Docs. 169 & 175).

As we previously stated, Defendant admits that he was on duty on January 3, 2004, and that his duties on this day included delivering medications in the SHU, where Plaintiff was housed. (Doc. 169, ¶ 6.).   Plaintiff avers that on January 3, 2004, he and his cellmate, James Hill, "made Frimpong verbally and visually aware of the fact that Plaintiff had an ear infection, ear ache, and a slimy pus-like fluid continuously leaking from the Plaintiff's right ear, and that Frimpong absolutely refused to offer or provide Plaintiff with medical attention."  (Doc. 39, ¶ 3.).  This averment, and whether there are any material disputed facts regarding it, is presently at issue.

Defendant responds to Plaintiff's averment as follows:

> 7.      Frimpong states that he does not recall speaking with Freeman on that date, but that if Freeman had made a complaint of an infectious discharge from his hear, Frimpong would have provided immediate attention thereto. Id. ¶ 4.

---

[8]Plaintiff makes no claim that his ear infection affected his left ear.

(Doc. 169, ¶ 7. & Doc. 166, Ex. 1, ¶'s 4.-5.).

Since Plaintiff has not responded to ¶'s 8.-11. of Defendant's current SMF, Doc. 169, we shall accept them as undisputed.  *See* Local Rule 56.1, M. D. Pa.   We incorporate the stated paragraphs by reference herein.

It is undisputed that Plaintiff was given a hearing test on January 12, 2004, and that Plaintiff was found to have bilateral hearing loss.  In his right ear, Plaintiff was found to have mild edema and mild erythema of his canal.  An ENT consult was ordered.  Plaintiff was advised to continue to take the antibiotics and ear drops he was prescribed.  (Doc. 166, Ex. 2, ¶ 5. & Doc. 39, ¶ 7. & Doc. 39, Att. 6).

Both parties agree that on February 13, 2004, Plaintiff had an audiometric evaluation by Vicki Egli, a licensed hearing aid fitter, with respect to his claimed loss of hearing in his right ear. (Doc. 169, ¶ 12. & Doc. 39, ¶ 10.).  Plaintiff states that he did not respond to or hear any sounds in his right ear, but that he could hear sounds in his left ear.   Defendant's evidence reveals that Ms. Egli felt that Plaintiff was misrepresenting the degree of his hearing loss, and she indicated that Plaintiff was able to hear normal speech without earphones despite the fact that he indicated he was not able to hear out of either ear during his testing.  Plaintiff claims that he could hear Ms. Egli fine during face-to-face speech since his left ear worked perfectly fine.  (Doc. 166, Ex. 2, ¶ 6. & Doc. 39, ¶ 10.).  (Doc. 166, Ex. 2, stamped p. 20).

It is undisputed that from February 13, 2004 through September 2005, Plaintiff only went to sick call once, on August 10, 2004, regarding his allergies.  (Doc. 166, Ex. 2, ¶ 7.).

On September 27, 2005, Plaintiff went to sick call for right ear pain, and he was examined by PA Bennett-Meehan.  The PA observed mild redness in Plaintiff's right ear canal, with no discharge and no swelling.  Plaintiff's readum was intact and had no perforation.  Plaintiff's left ear was within normal limits.  Plaintiff was given ear drops, and the PA directed him to stop putting water in his right ear.  (Doc. 166, Ex. 2, ¶ 8.).  In his current Amended SMF, Plaintiff argues that the September 27, 2005 exam is not relevant to his case, and that only the January 12, 2004 exam is relevant.  (Doc. 175, p. 1, ¶ 17.).  However, Plaintiff fails to recognize that his Eighth Amendment claim against Defendant relates to whether he was permanently injured or suffered a permanent hearing loss as a result of Defendant's alleged failure to treat his serious right ear condition on January 3, 2004.  Thus, we find Defendant's evidence as to Plaintiff's right ear condition during 2005 and 2006 as highly relevant to Plaintiff's claims in this case.  We further note that Plaintiff does not dispute the findings of the PA on September 27, 2005. (*Id*.).

Plaintiff does not dispute (Doc. 175) Defendant 's SMF, ¶ 21. (Doc. 169), that on November 18, 2005, Plaintiff was again tested by Ms. Elgi, and that she found normal responses from testing Plaintiff's left ear and no responses from testing Plaintiff's right ear.  It is undisputed that Ms. Elgi concluded that she questioned the results of Plaintiff's testing.  (Doc. 166, Ex. 2, stamped p. 18).  She recommended that the prison check the results regarding Plaintiff's previous test.

On March 6, 2006, Plaintiff was tested by clinical audiologist Sandra Chamberlin, M.S.  She found Plaintiff "Failed Stenger[9] at all frequencies.  Hearing loss is functional.  Audiological eval.

---

[9]A Stenger Test is a test for detecting simulation of unilateral hearing impairment, in which a tone below the admitted threshold is presented to the test ear and a tone of lesser intensity is presented to the other ear.  If the subject is feigning a hearing loss, the lesser tone

Reveals normal hearing in the left ear.  Patient did not respond to any stimuli in the right ear... ."

(Emphasis original) (Doc. 166, Ex. 2, stamped p. 21).

On May 30, 2006, Plaintiff was evaluated by Dr. Whitaker, MD, an ENT, and he conducted an Auditory Brainstem Response ("ABR") test.[10]  Upon examination of Plaintiff's ears, Dr. Whitaker found as follows:

> Ears: suriclax are normally formed without lesions, external
> auditory canals are patent and without lesion, tympanic
> membranes are intact and freely mobile without perforation,
> effusion or significant retraction pockets.

(*Id.*, p. 22).   Dr. Whitaker found the following Audiogram results:

> Audiogram:
>
> Right Ear: profound, panfrequency hearing loss, speech discrimination
> is unable to be tested.
>
> Left Ear: hearing within normal limits, speech discrimination is
> 96 percent at 50 dB.

(*Id.*, pp. 22-23).

Dr. Whitaker also administered a Stenger test which revealed:

> Positive speech Stenger at 10dB above left SRT.
> Positive pure tone Stenger 5-10 dB over left thresholds.
> Distortion and transient OAE's [OtoAcoustic Emission]
> were complete pass bilaterally.  Threshold ABR was present

---

cannot be appreciated.  1810 *Stedman's Medical Dictionary*, 27th Ed. (2000).

[10]Auditory Brainstem Response or Auditory Brainstem Response Audiometry is a screening test to monitor for hearing loss or deafness in newborn infants.  It is a method employed to assess the functions of the ears, cranial nerves, and various brain functions, auditory brain center, prior to the child developing to the point of describing a possible hearing problem.  *http://en.wikipedia.org/wiki/Auditory_Brainstem_Response.*

> down to 40 dB on the right.  Patient did not cooperate to
> complete ABR testing.

(*Id.*, p. 23).  Dr. Whitaker's impression was "Right pseudohypacusis.[11]"  (*Id.*).

Dr. Whitaker's Plan was as follows:

> Plan:
> The examination and audiometric findings were discussed
> with the patient.  He was informed that his volunteered responses
> do not match the objective measures of hearing performed today.
> I can not rule out a mild hearing loss on the right which may make
> Mr. Freeman a candidate for amplification, however, it is impossible
> to recommend amplification without a reliable audiogram.  This was
> discussed with the patient.  No further workup is indicated at this time.
> A consult note as well as the audiometric test results were sent
> with the patient.

(*Id.*).[12]

We agree with Defendant's SMF, Doc. 169, ¶ 34., that Dr. Whitaker found that Plaintiff's volunteered responses to his hearing test did not match the objective measures of hearing performed on May 30, 2006.  We also concur with Defendant that Dr. Whitaker found that Plaintiff had false hearing loss in his right ear.  (*Id.*, ¶ 's 35.- 36. &   (Doc. 166, Ex. 2, stamped p. 23).  Dr. Whitaker could not rule out a mild hearing loss of Plaintiff's right ear, but concluded that it was impossible to recommend amplification for Plaintiff without a reliable audiogram.  (*Id.*).

---

[11]Pseudohypacusis is nonorganic hearing loss.  *Childhood pseudohypacus in patients with high risk for actual hearing loss*, Radkowski, D., Cleveland S. Friedman EM.; www.pubmed.gov.

[12]Since Plaintiff disputed the claimed findings and conclusions of Dr. Whitaker as represented by Defendant in his SMF (Doc. 175, ¶'s 28., 29, 30, 33, 36) we have directly quoted from Dr. Whitaker's evaluation.

**IV. Discussion.**

As we stated in our prior Report and Recommendation (Doc. 104, p. 10), with respect to whether Plaintiff had stated that a clearly established Constitutional right existed at the relevant time of this case for purposes of making our qualified immunity analysis:

> The Plaintiff alleges that the conduct of Defendant Frimpong violated his Eighth Amendment right, in that Defendant was deliberately indifferent to his serious right ear infection medical condition and that the delay in treatment resulted in permanent hearing loss in the ear. We find that the allegations set forth by the Plaintiff, viewed in the light most favorable to him, do make out a constitutional violation. *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2001). The evidence is in dispute as to whether Plaintiff told Defendant on January 3, 2004, about his right ear infection and that "slimy pus was leaking from my right ear" as well as that he had an ear ache. The evidence is also disputed as to whether Defendant refused to give him treatment on this day for this condition. Plaintiff's evidence, bolstered by inmate Hill's affidavit (Doc. 52), indicates that he told Defendant about an active ear infection on January 3, 2004, and that Defendant ignored his request for treatment. Defendant does not recall speaking to Plaintiff on the day in question but admits that if Plaintiff did complain about an infection, he would have provided immediate medical care. (Doc. 80, Ex. 1). Contrary to Defendant's assertion that there is no evidence to show that he was aware Plaintiff had an active ear infection on the day in question (Doc. 79, p. 7), Plaintiff has provided evidence that he told Defendant of his right ear infection in no uncertain language and that Defendant told him that there was nothing he could do since he was only passing out pills. (Doc. 38, Ex. 1). The record is not clear if Plaintiff suffered any loss of hearing in his right ear as a result of his alleged delayed treatment (*i.e.* from January 3, 2004 until January 6, 2004) for his ear.

As this Court recently stated in *Anderson v. BOP*, 2005 WL 2314306 (M.D. Pa. 2005), *7:

> The Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." *Rouse v. Plantier*, 182 F.3d

13

192, 197 (3d Cir.1999)(*citing Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). To establish a medical claim based on the Eighth Amendment, an inmate must allege (1) acts or omissions by prison officials sufficiently harmful (2) to evidence deliberate indifference to a serious medical need. *See Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir.2004); *Natale v. Camden County Corr. Facility,* 318 F.3d 575, 582 (3d Cir.2003). The inmate must satisfy this two-part, conjunctive test. Without the requisite mental state, a prison official's conduct alone will not constitute deliberate indifference. *See Farmer v. Brennan,* 511 U.S. 825, 837-38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

In the context of prison medical care, the Eighth Amendment can be violated by the deliberate indifference of: (1) prison doctors in their response to the prisoner's needs; (2) prison guards intentionally denying or delaying access to medical care; or (3) prison staff intentionally interfering with medical treatment once it is prescribed. *Estelle v. Gamble,* 429 U.S. 97, 104--105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). However, if a prisoner is under the care of a medical experts, a non-medical prison official cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner...." *Spruill,* 372 F.3d at 236; *Durmer v. O'Carroll,* 991 F.2d 64, 69 (3d Cir.1993) (prison personnel who are not physicians cannot be considered deliberately indifferent for failing to respond to an inmate's medical needs when the inmate is already receiving treatment from the prison's medical staff).

To be deliberately indifferent, a prison official must know of, and disregard, an excessive risk to inmate health or safety. *Farmer, supra,* 511 U.S. at 837-38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment...." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Accordingly, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." *Id.,* 429 U.S. at 107, 97 S.Ct. at 293. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg,* 903 F.2d 274, 278 (3d Cir.1990). Further, a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment.

See White v. Napoleon, 897 F.2d 103, 110 (3d Cir.1990). In sum, negligence, unsuccessful medical treatment, or medical malpractice do not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir.1993).

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825 (1994) citing Helling v. McKinney, 509 U.S. 25 (1993); Wilson v. Seiter, 501 U.S. 294 (1991); Estelle v. Gamble, 429 U.S. 97 (1976). An inadequate medical care claim, as we have here, requires allegations that the prison official acted with "deliberate indifference to serious medical needs" of the plaintiff, while a prisoner. Estelle, 429 U.S. at 104 (1976); Unterberg v. Correctional Medical Systems, Inc., 799 F. Supp. 490, 494-95 (E.D. Pa. 1992). The official must know of and disregard an excessive risk to inmate health or safety. Farmer, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. "The question...is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" Farmer, 511 U.S. at 843.

In order to state a viable Eighth Amendment claim, a prisoner must demonstrate that the Defendant was deliberately indifferent to his medical needs and that those needs were serious. Estelle, 429 U.S. at 106.

Mere disagreement as to the proper medical treatment does not support a claim of an Eighth Amendment violation. Monmouth County Correctional Institution Inmates v. Lensaro, 834 F.2d 326 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988); see also Durmer v. O'Carroll, 991 F. 2d 64, 67

15

(3d Cir. 1993) ('[T]he law is clear that simple medical malpractice is insufficient to present a constitutional violation."). As such, "[a] distinction must be made between a case in which the prisoner claims a complete denial of medical treatment and one where the prisoner has received some medical attention and the dispute is over the adequacy of the treatment." *Nottingham v. Peoria*, 709 F. Supp. 542, 547 (M.D. Pa. 1988) *citing United States ex. rel. Walker v. Fayette County*, 549 F.2d 573, 575 n.2 (3d Cir. 1979).

In the case of *Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987), the court addressed whether the Plaintiff's alleged injuries rose to the level of being sufficiently serious for the purpose of establishing an Eighth Amendment violation. The *Monmouth County* case stated that:

> "A medical need is 'serious,' in satisfaction of the second prong of the *Estelle* test, if it is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Pace v. Fauver*, 479 F.Supp. 456, 458 (D.N.J. 1979), *aff'd*, 649 F.2d 860 (3d Cir. 1981); *accord Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977). The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment. For instance, *Estelle* makes clear that if 'unnecessary and wanton infliction of pain,' 429 U.S. at 103, 97 S.Ct. at 290, results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment. *See Id*, at 105, 97 S.Ct. at 291. In addition, where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious. (*Citations omitted*)."

*Monmouth County,* 834 F.2d at 347(3d Cir. 1987).

Defendant now argues (Doc. 166, p. 5) that Plaintiff has not met the first hurdle of *Estelle,* *i.e.,* Defendant was deliberately indifferent to his serious medical need, as he fails to show that he

16

had a serious right ear condition on January 3, 2004.  Defendant points out that Plaintiff has not offered any expert report that shows his ear condition was serious.  (*Id.*, p. 7).  However, based on the record, we agree with Plaintiff (Doc. 172, p. 1), and we find that Plaintiff has sufficiently met the first prong of *Estelle* regarding the seriousness of his right ear condition at the time in question. We have quoted Plaintiff's Declaration above as to the condition of his right ear at the time in question, and we will not repeat it in full.  Suffice to say that Plaintiff averred that on January 3, 2004, he made Defendant visually and verbally aware that he had an ear infection and that "pus was leaking from my right ear." (Doc. 38, Ex. 1, ¶ 11.).  At his deposition, Plaintiff testified that on January 3, 2004, he said to Defendant that he had an ear infection and that it was hurting real bad, and that he could not sleep.  Plaintiff stated that he asked Defendant for some medicine.  Plaintiff stated that Defendant told him that Defendant  was not conducting sick call, that Defendant  was only passing out the other line medicine, and that Plaintiff had to wait until Monday.  (Doc. 166, Ex. 3, NT 20).  Plaintiff testified that his cellmate also told Defendant about Plaintiff's ear infection. Plaintiff stated that on January 5, 2004, his ear was still hurting and he had pus coming out of his ear.  (*Id.*, NT 26).  On January 6, 2004, Plaintiff stated that the PA brought him medicine, Amoxicillin and ear drops.  (*Id.*, NT 32-33).

Notwithstanding Plaintiff's initial refusal to be evaluated by a PA on January 5, 2004, Plaintiff was treated on January 6, 2004, for a presumed ear infection and given antibiotics and ear drops. On January 12, 2004, Plaintiff claimed that he had decreased hearing in his right ear even though he took the medications prescribed for him.  An examination on January 12, 2004, revealed that Plaintiff had right ear TM mild edema and mild erythema of the canal.  (Doc. 39, Atts. 2 &  6, Doc.

166, Ex. 2, stamped p. 29).  Plaintiff's "audiometric responses were that of bilateral profound hearing loss inconsistent with normal conversation." (Doc. 166, Ex. 2, stamped pp. 15, 29). Plaintiff had an audiology exam on February 13, 2004, and he claimed that he could not hear when tested in his right ear.  He could converse with Ms. Elgi.  Her conclusion was that Plaintiff was misrepresenting his hearing loss.  (*Id.*, p. 20).

We find that Plaintiff has shown that he had a serious medical need regarding his right ear infection on January 3, 2004.[13]

Plaintiff also claims that Defendant denied him required medical care for his right ear condition on January 3, 2004, and that Defendant was responsible for his permanent loss of hearing in his right ear.  We do not find that the evidence shows that Plaintiff suffered any resulting injury due to his claim that Defendant failed to treat him on January 3, 2004.  We also disagree with Plaintiff (Doc. 172, p. 2) that whether or not he suffered a permanent or lasting injury is not relevant for summary judgment purposes.

In *Monmouth, supra,* 834, F. 2d at 347, the Court said that a medical need is serious if the delay or denial of health care results in "wanton infliction of pain, lifelong handicap or permanent loss."   We do not find, based on the evidence presented,  that the claimed 3-day delay in treating Plaintiff's right ear infection caused him any permanent hearing loss in that ear.  On January 12,

---

[13]We disagree with Defendant's characterization of the evidence as showing only that Plaintiff had an earache.  Rather, we find that the record shows that Plaintiff had an ear infection which required antibiotics and ear drops.   In fact, Plaintiff was treated as if he had an ear infection.   We are well aware that an ear infection, if left untreated, may, in some circumstances, cause damage to an ear and loss of hearing, and we find that such an understanding is recognized by a lay person.

2004, Plaintiff had only mild edema and mild erythema of his right TM.  At the time, Plaintiff reported he was no longer in pain but that he had decreased hearing. (Doc. 166, Ex. 2, stamped, p. 17).  However, his claimed hearing loss at this time did not reflect his ability to hear normal conversation.  (*Id.*).  Dr. Whitaker's May 30, 2006 examination of Plaintiff found that his canals were patent and without lesion, his tympanic membrane (TM) were intact and freely mobile without perforation, effusion or significant retraction pockets.  (Doc. 166, Ex. 2, stamped,  p. 22). Thus, physically, both of Plaintiff's ears were found by the doctor to be quite normal. Upon objective testing of Plaintiff's hearing by Dr. Whitaker, it was found that Plaintiff had right pseudohypacusis.  Plaintiff's volunteered responses did not match the objective measures of the hearing which Dr. Whitaker performed.  Dr. Whitaker concluded that he could not rule out that Plaintiff may have a mild hearing loss on the right but stated that it was not conclusive without a reliable audiogram.  (*Id.*, p. 23).  We do not find, as Plaintiff argues (Doc. 172, p. 2), that Dr. Whitaker's examination verifies his claim that he is deaf in his right ear.

Plaintiff has presented no evidence that he has, in fact, suffered permanent hearing loss in his right ear as a result of the claimed delay in treating his right ear infection.   Plaintiff argues that he should be permitted to cross-examine Dr. Whitaker at trial to prove his case that he has true hearing loss in his right ear. (*Id.*, p. 3).  However, when facing a summary judgment motion which Defendant has substantiated with evidence, Plaintiff had to come forward with evidence of his own at this time to show that a material factual dispute exists in this case regarding his Eighth Amendment claim.  Plaintiff has failed to do this, and thus, we do not find that his case should proceed to trial.

In short, there is no evidence that Defendant acted with deliberate indifference and exposed Plaintiff to a substantial risk of serious harm to his right ear and permanent loss of hearing.  As mentioned, the undisputed medical evidence shows that Plaintiff's right ear is physically normal and that he had no significant loss of hearing  in this ear that can be established by objective medical testing.

Therefore, we will recommend that Defendant's Summary Judgment Motion be granted.

**V.  Recommendation.**

Based on the foregoing, it is respectfully recommended that Defendant Frimpong's Summary Judgment Motion **(Doc. 158)** be granted, and that judgment be entered in favor of the Defendant and against the Plaintiff.

<u>**s/ Thomas M. Blewitt**</u>
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: October 11, 2006**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHERWYN D. FREEMAN, JR., | : | CIVIL ACTION NO. **3:CV-04-1546** |
| | : | |
| Plaintiff | : | |
| | : | (Judge Munley) |
| | : | |
| v. | : | (Magistrate Judge Blewitt) |
| | : | |
| DIANE INCH, et al., | : | |
| | : | |
| Defendants | : | |

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **October 11, 2006.**

Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3, which provides:

Any party may object to a magistrate judge's proposed findings,
recommendations or report addressing a motion or matter described in
28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
disposition of a prisoner case or a habeas corpus petition within ten (10)
days after being served with a copy thereof.  Such party shall file
with the clerk of court, and serve on the magistrate judge and all
parties, written objections which shall specifically identify the
portions of the proposed findings, recommendations or report to which
objection is made and the basis for such objections.  The briefing
requirements set forth in Local Rule 72.2 shall apply.  A judge shall
make a *de novo* determination of those portions of the report or
specified proposed findings or recommendations to which objection
is made and may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge.  The judge, however,
need conduct a new hearing only in his or her discretion or where
required by law, and may consider the record developed before the

21

magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

 

 

           **s/ Thomas M. Blewitt**
           **THOMAS M. BLEWITT**
           **United States Magistrate Judge**

**Dated: October 11, 2006**

4.   It is further **ORDERED** that discovery in this case is **STAYED** pending disposition of Defendant's second Summary Judgment Motion by the Court.

_____

**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: August   , 2005**