## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHERWYN D. FREEMAN, JR.,** | : | **No. 3:04cv1546** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **CLEMENTE FRIMPONG,** | : | |
| **Defendant** | : | |

### MEMORANDUM

Before the court are objections by both the plaintiff (Doc. 185) and the

defendant (Doc. 190) to the report and recommendation of United States Magistrate

Judge Thomas M. Blewitt (Doc. 164) in this case.  The matter has been fully briefed

and is ripe for disposition.

**Background**

**A.  Factual Background**

On January 3, 2004, plaintiff was an inmate at the United States Penitentiary

in Allenwood, Pennsylvania ("USP Allenwood").  On that day, he suffered from a

painful earache, and had discovered that he was leaking pus from his right ear.

(Complaint (hereinafter "Complt.) at 4).  That evening, he told Defendant Frimpong

of his condition.  (Defendant's Deposition (hereinafter "Deposition"), Attached as an

exhibit to Defendant's Brief in Support of Motion for Summary Judgment (hereinafter

"Summary Judgment Brief") (Doc. 166) at 20).  According to the plaintiff, PA

Frimpong told him that he could do nothing because he was simply passing out pill-

line medication and not taking sick calls.  (Id.).  As sick call was not available on the

weekend, plaintiff would have to wait until Monday for assistance.  (Id.).  The plaintiff,

his cell mate, and Frimpong argued for a few minutes.  (Id. at 20-21).  Plaintiff tried

to convince Frimpong to get him some medicine from the infirmary but Frimpong

refused.  (Id. at 21).[1]  Frimpong then left, and plaintiff received no treatment.

January 3, 2004 was a Saturday, and plaintiff did not receive medical attention for

the rest of that weekend.  (Id. at 21-22).  Plaintiff had no more contact about his

earache with the defendant.  (Id. at 22).  He complained of his ear infection again on

Monday, January 5, and officers arrived at plaintiff's cell to take him for a medical

examination.  (Id. at 27).  Plaintiff claims he could not leave his cell because his

cellmate refused to cooperate with officers.  (Id.).  Eventually, plaintiff received

treatment on January 6, 2004.  (Id. at 33).  A PA brought him Amoxicillin tablets.

(Id.).  On January 12, 2004, plaintiff saw a prison doctor about his alleged hearing

loss and other complaints.  (Id. at 34).

Plaintiff alleges that he realized at 7:45 a.m. on January 5, 2004 that he had

completely lost his hearing in his right ear.  The prison soon conducted tests to

determine what injuries plaintiff had suffered.  A test administered on January 12,

---

[1]Plaintiff apparently wanted Frimpong to obtain medication outside of the normal channels and without any sort of examination.  According to his deposition testimony, plaintiff said to Frimpong:

> "I say, man [to Frimpong], there's something you can do because you got the keys to the examination room and you got the keys to the medicine stockroom.  You can get [sic] go get me some penicillin and you can give me some pain medicine or, you know, whatever I need."  (Deposition at 21).

2004 by prison medical staff  revealed that plaintiff suffered from bilateral hearing loss.  (See Chronological Record of Medical Care, results of exam dated January 12, 2004, attached as an exhibit to summary judgment brief, at 15).  The examination also revealed a mild swelling of the right eardrum and mild redness of the right ear canal.  (Id.).  The prison ordered a consultation with an ENT doctor and advised plaintiff to continue with his prescribed medication.  (Id.).  On February 13, 2004, Vicki Egli, a licensed hearing aid fitter, evaluated plaintiff using audiometric testing.  (Letter from Vicki Egli to Ron Laino July 9, 2004, id. at 20).  She reported that plaintiff had misrepresented the degree of his hearing loss; he seemed able to hear normal speech with and without earphones, but claimed he could not hear out of either ear when she did her tests with the audiometer.  (Id.).  Nearly two years later, on September 27, 2005, plaintiff again complained of pain in his right ear.  (Id. at 10).  A physician's assistant examined him and reported mild redness in the right ear canal, but no discharge or swelling.  (Id.).  The eardrum was intact without perforation.  (Id.).  She found no problems in the right ear.  (Id.)  Plaintiff received drops for the right ear and advice to stop putting water in the ear.  (Id.).  Egli again tested plaintiff on November 18, 2005, finding no responses from his right ear.  (Id. at 18).  She questioned that response.  (Id.).

Faced with continued complaints from the plaintiff, the prison conducted more extensive testing.  An examination by clinical audiologist Sandra M. Chamberlain on March 6, 2006 found plaintiff responding on a functional level, which meant that

plaintiff's claims of hearing loss were "contrived."  (Id. at 21).  A Stenger test, designed to reveal when a claimed hearing loss is not genuine, also found that plaintiff did not suffer the hearing problems he alleged.  (Id.).  These results led to evaluation of the plaintiff by an ENT specialist at the Geisinger Medical Center in Danville, Pennsylvania on May 30, 2006.  At that examination, plaintiff was scheduled to undergo an ABR test, a diagnostic test that measures brain wave activity in the auditory centers of the brain in response to a series of clicks presented to each ear.  (Id. at 23).  He refused to cooperate.  (Id.).  Dr. Mark E. Whitaker, who examined plaintiff, confirmed that plaintiff had not lost his hearing in his right ear. (Id.).  He did not rule out mild hearing loss in that ear, but urged the plaintiff to be more compliant with tests in order to determine what treatment was necessary.  (Id.).

## B.  Procedural History

On July 16, 2004, plaintiff filed a *pro se Bivens*[2] action**,** naming two employees of the prison as defendants.  (See Complt.).  Both Diane Inch and Clemente Frimpong were employed as Physician's Assistants (PAs) by the Federal Bureau of Prisons.  Plaintiff claimed that he did not receive proper medical care for a serious ear infection.  This lack of care, he alleged, resulted in profound hearing loss. Plaintiff sought several million dollars in damages and release from the six years remaining on his prison term.

---

[2]Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics, 403 U.S. 388 (1971).  Bivens allows federal officials acting under color of their authority to be sued for violations of claimants' constitutional rights.  Id. at 389.

After the court completed an initial screening of the complaint and ordered that the complaint be served on the defendants, defendants filed motions to dismiss the complaint.  On March 16, 2005, the Magistrate Judge recommended that the complaint be dismissed with respect to defendant Inch, but that the complaint against defendant Frimpong be continued (See Report and Recommendation (Doc. 49)).  This court adopted that recommendation and remanded the case to the magistrate judge (See Memorandum and Order (Doc. 53)).  After this court adopted (See (Memorandum and Order (Doc. 106)) the magistrate judge's subsequent recommendation to deny Defendant Frimpong's motion for summary judgment based on qualified immunity (See Report and Recommendation (Doc. 103)), discovery commenced.  When discovery ended, defendant filed a second motion for summary judgment (Doc. 158) on June 21, 2006.  On October 11, 2006, Magistrate Judge Blewitt issued a report and recommendation that proposed we grant summary judgment to the defendant because the plaintiff had failed to produce evidence by which a court could conclude that defendant had been deliberately indifferent to plaintiff's serious medical need.  (See Doc. 184).   The magistrate judge found that plaintiff had indeed suffered a serious medical need, but that plaintiff had failed to present evidence that showed he was injured as a result of defendant's failure to procure him immediate treatment for his injury.

**Legal Standard**

In disposing of objections to a magistrate judge's report and recommendation,

the district court must make a *de novo* determination of those portions of the report to which objections are made.  28 U.S.C. § 636 (b)(1)(C); <u>see</u> <u>also</u> <u>Henderson v. Carlson</u>, 812 F.2d 874, 877 (3d Cir. 1987).  This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The district court judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. <u>Id.</u>

As the magistrate judge ruled on a motion for summary judgment, we will apply that standard as well. Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  <u>See</u> <u>Knabe v. Boury</u>, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing Fed. R. Civ. P. 56(c)). "[T]his standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion.  <u>International Raw Materials, Ltd. v. Stauffer Chemical Co.</u>, 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. <u>Anderson</u>, 477

U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit

under the governing law.  Id.  Where the non-moving party will bear the burden of

proof at trial, the party moving for summary judgment may meet its burden by

showing that the evidentiary materials of record, if reduced to admissible evidence,

would be insufficient to carry the non-movant's burden of proof at trial.  Celotex v.

Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the

burden shifts to the nonmoving party, who must go beyond its pleadings, and

designate specific facts by the use of affidavits, depositions, admissions, or answers

to interrogatories showing that there is a genuine issue for trial.  Id. at 324.

**Objections to the Report and Recommendation**

The parties offer three objections to the report and recommendation.  We will

address each in turn, applying the foregoing legal standards.

**A.  The magistrate judge's finding that plaintiff has not introduced sufficient evidence that he suffered permanent hearing loss**

Magistrate Judge Blewitt concluded that plaintiff had not presented sufficient

evidence that he had suffered a permanent injury as a result of defendant's actions.

Plaintiff objects to this finding.  As our decision on this factual matter will influence

greatly our evaluation of the other objections in this case, we will begin our

discussion with this objection.  Plaintiff argues that he has demonstrated he suffered

hearing loss, and that medical reports confirm this injury.  Plaintiff argues that

medical tests performed by Dr. Mark Whitaker indicate that he suffered from

"profound hearing loss" in his right ear.

A series of doctors and hearing specialists saw the plaintiff about his claimed hearing loss.  Each of the specialists who examined him concluded that there was no medical evidence to show that plaintiff had suffered any profound hearing loss.  These experts suspected he was faking his loss of hearing, and the tests they performed confirmed these suspicions.  Vicki Egli tested plaintiff's hearing on February 13, 2004.  (See Exhibits at 20).  She later wrote the warden of Allenwood Prison to inform him that when she spoke to plaintiff before testing him he seemed to understand her perfectly.  (Id.).   When he put on headphones, however, he claimed an inability to hear in either ear.  (Id.).  Egli concluded that plaintiff was "misrepresenting his hearing loss."  (Id.).  She came to the same conclusion when she tested him on November 18, 2005.  (Id. at 18).

As plaintiff still complained of hearing loss, the prison had him evaluated by Sandra Chamberlain, a clinical audiologist.  (Id. at 21).  She reported that plaintiff claimed an inability to hear in his right ear, but that he had "failed Stenger at all frequencies," and that his "hearing loss is functional."  (Id.).  This complaint led to an evaluation by Dr. Mark Whitaker, who examined plaintiff on March 30, 2006.  (Id. at 22).  This examination was hampered by plaintiff's refusal to cooperate with ABR testing.[3]   (Id. at 23).  Dr. Whitaker nevertheless performed tests that revealed that

---

[3]A(uditory) B(rainstem) R(esponse) testing "does not rely on any form of subjective response from the individual being testing."  Auditory Brainstem Response (ABR), The Hearing & Speech Center.  At http://www.hearingcenter.com/services/abr.html.  The testing

plaintiff's complaints of hearing loss were "inconsistent" with the observable medical evidence.  (Id.).  In short, plaintiff's complaints led to a variety of medical tests that sought to determine the extent of his hearing loss.  The examinations became increasingly extensive, involving more sophisticated equipment and measures.  All came to the same conclusion: there was no medical evidence to support plaintiff's claims of profound hearing loss to his right ear.

Plaintiff has not offered any evidence that rebuts these conclusions, though he points to two diagnoses which he says indicate that he had a hearing loss.  Plaintiff misreads these opinions.  First, he points to a May 30, 2006 examination he claims indicated he "passed" a Stenger Test.[4]  (Exhibits at 24).   A Stenger Test is used to "[detect] simulation of unilateral hearing impairment."  http://www.drugs.com/dict/stenger_test.html.  In that test, "a tone below the admitted threshold is presented to the test ear and a tone of lesser intensity is presented to the other ear.  If the subject is feigning a hearing loss, the lesser tone cannot be

_____

system measures brain wave activity in response to a series of clicks in each ear.  A patient tested using ABR rests quietly, sometimes under sedation.  Id.  The examiner inserts earpieces in the ear canal.  Id.  These earpieces deliver a series of clicks, the intensity of which can be varied.  Id.  A headband records the brain activity in response to these clicks and a computer compares these responses to normal ones.  Id.

[4]We note that plaintiff's Stenger results were recorded as "pass" for both his right and left ear, indicating that "pass" does not mean, as plaintiff apparently claims, that he had experienced hearing loss in his right ear.  (Exhibits to Summary Judgment Motion at 25-26).  Additionally, the results of that test are almost identical for both ears, leading us to conclude that no medical evidence of profound hearing loss can be found in these tests.  Further, Dr. Whitaker noted that plaintiff's claims of hearing loss "do not match the objective measures of hearing performed today."  (Id. at 23).  The Stenger test was one such measure.

appreciated." Id.  The medical evidence is clear, however, that the Stenger Test

revealed that plaintiff did not have an organic hearing loss, and that he was

simulating his alleged injury.  Dr. Whitaker said as much, noting that plaintiff's

claimed hearing loss "[did] not match the objective measures of hearing performed

today."  (Id. at 23).

Second, plaintiff contends that Dr. Whitaker diagnosed him with a "profound'

hearing loss.  (Doc. 185) at 2.  Part of Dr. Whitaker's diagnosis did conclude that

plaintiff suffered from a profound hearing loss according to an audiogram he

performed.[5]  (Id. at 22-23).  This diagnosis was not the end of Dr. Whitaker's

analysis, however.  Dr. Whitaker then performed a Stenger Test to determine

whether plaintiff was actually experiencing his claimed limitations.  (Id. at 23).  That

test led Dr. Whitaker to conclude that plaintiff claimed hearing loss did not match his

actual perceptions.  (Id.).  He suspected that plaintiff may have suffered from a "mild

hearing loss" that could be aided by the use of a hearing aid, but found "it is

impossible to recommend amplification without a reliable audiogram."  (Id.).  Clearly,

then, Dr. Whitaker did not credit plaintiff's claims of hearing loss, and his report

should not be taken as evidence that plaintiff suffered a significant injury when

defendant failed to seek out treatment for him.

Dr. Whitaker's ultimate diagnosis was pseudohypacusis.  (Id.).  The plaintiff

---

[5]An audiogram is "the graphic record drawn from the results of hearing tests with an audiometer, which charts the threshold of hearing at various frequencies against sound intensity in decibels."  http://www.drugs.com/dict/audiogram.html.

argues that this terms means "abnormal defective hearing," and does not indicate that a doctor has determined that plaintiff's loss is feigned.  (Plaintiff's Opposition to Defendant's Opposition to Plaintiff's Objection to the Magistrate's Report and Recommendation (Doc. 191) at 2).  He contends that "there is no such thing as <u>false</u> or <u>non organic</u> <u>hearing loss</u>.  A person either has hearing loss or they do not." (Defendants Objections to Report and Recommendation (Doc. 185) at 2) (emphasis in original).  Definitions of medical terminology do not support this claim.  According to DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, "pseudohypacusis" means "functional hearing loss."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (30th Ed. 2003).  "Functional" means "a disorder of physiological function having no known organic basis."  <u>Id.</u>; <u>see also</u> STEDMAN'S MEDICAL DICTIONARY, (5th Unabridged Lawyer's Ed. 1982) (defining "functional" as "used in the sense of nonorganic, i.e., a functional ailment is one that is not caused by a structural defect.").  In medical language, then, a diagnosis of "pseudohypacusis" is a diagnosis that the hearing loss claimed by the patient is not one that can be attributed to any physical problem or defect.  In legal terms, there is no medical evidence of hearing loss, and plaintiff's claims that this diagnosis is evidence that he suffers from an actual hearing loss are misguided.  Plaintiff has not, therefore, pointed to any medical evidence a jury could use to conclude that he suffers from a profound hearing loss.   Accordingly, we will adopt the report and recommendation on this point.

**B.  The finding that plaintiff's ear condition constituted a serious medical need**

Having established that the magistrate judge correctly determined that no evidence existed to demonstrate that plaintiff suffered any permanent injury from the delays in his medical treatment, we can now address the other objections to the report and recommendation.  Defendant objects to the magistrate judge's finding that plaintiff had a serious medical need on January 3, 2004.  An ear infection as reported by the plaintiff, defendant argues, is not the sort of illness that a reasonable person would consider serious enough to require immediate emergency treatment.  Since the magistrate judge found that the plaintiff did not suffer from a permanent injury that could be traced to the defendant's conduct, no serious medical need could have existed in the days before plaintiff received treatment.

Addressing this objection will help us establish whether plaintiff's claim should go forward.  Finding that a plaintiff suffered from a "serious" medical need is a prerequisite to establishing a violation of an inmate's Eighth Amendment right to be free of cruel and unusual punishment.  The Supreme Court has established that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).  In other words, a prisoner must meet a two-part test to claim a violation of his constitutional rights based on inadequate medical treatment: "it requires deliberate indifference on the part of the prison officials and it requires the

prisoner's medical needs be serious." <u>West v. Keve</u>, 571 F.2d 158, 161 (3d Cir.

1977).  "A 'serious' medical need may fairly be regarded as one that has been

diagnosed by a physician as requiring treatment or one that is so obvious that a lay

person would easily recognize the necessity for a doctor's attention." <u>Pace v.</u>

<u>Fauver</u>, 479 F. Supp. 456 (D. N.J. 1979).  Courts can look to the outcome of failing

to treat a medical need when determining whether that need was "serious."  <u>See</u>

<u>Estelle</u>, 429 U.S. at 103-4 (holding as potentially unconstitutional denying medical

care that leads to "pain and suffering which no one suggests would serve any

penological purpose.").

We will sustain this objection.  We disagree with the defendant, however, that

this case is like <u>Spencer v. Simon Candy Co.</u>, No. 92-3773, 1992 WL 164534 (E.D.

Pa. July 6, 1992) and <u>Martin v. Tyson</u>, 845 F.2d 1451 (7th Cir. 1988), two cases

where courts concluded in a cursory fashion that an earache did not constitute a

serious medical condition.  In those cases, there was no evidence that the plaintiff

complained of more than a simple earache.  Here, the plaintiff produced evidence

that he complained of not only an earache, but that his earache had caused fluid to

leak out of his ear and down his neck.  That condition, at least on its face, is

qualitatively different from those faced by the plaintiffs in the cases defendants cite.

That the condition is severe and worthy of prompt medical attention might even

appear obvious on its face to an ordinary layperson. <u>See</u> <u>Monmouth County</u>

<u>Correctional Institution Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987) (finding

that a serious medical condition exists if the condition is "one that has been

diagnosed by a physician as requiring treatment or one that is so obvious that a lay

person would easily recognize the necessity for a doctor's attention."). A reasonable

person could conclude that someone visibly leaking fluid from his ear needed to see

a doctor immediately or face a debilitating injury.

If plaintiff had not been treated at all, we would probably agree with the

magistrate judge that plaintiff suffered from a serious medical condition.[6] In this

case, however, plaintiff's complaint appears to be that his treatment was delayed for

two and one-half days, first because the defendant had no treatment available from

Saturday evening until Monday morning, and then because plaintiff was offered

treatment by the prison for twenty-four hours but could not accept it due to his (or his

cellmate's) obstinance.[7] In a situation where a defendant delays treatment but

---

[6]We recognize that courts have stated that "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." Monmouth, 834 F.2d at 347. Here, obviously, there was no permanent loss. We decline, however, to adopt defendant's argument that this lack of loss necessarily precludes plaintiff from proving that his medical need was a serious one. Not all serious medical needs result in permanent injuries when a person is denied treatment–a plaintiff could suffer a stroke from being denied heart medication and quickly recover, manifesting no life-long handicap or permanent loss–and we think that focusing on the outcome of refusal to treat a serious illness rather than on the nature of the illness when a defendant chose not to treat it would allow defendants with the good fortune not to cause permanent injuries to violate prisoner's constitutional rights without being held accountable.

[7]We note that there could be no violation of plaintiff's constitutional rights if he had been permanently injured after refusing treatment offered by the prison. See Groman v. Twp. of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995) (holding that no deliberate indifference to a serious medical need occurred when plaintiff "consistently and obstinately rejected" defendants' offers of medical care"). Since plaintiff's cellmate may have been responsible for the delay, we do not think we can automatically exclude any injury suffered by the plaintiff during this period when he was offered, but did not obtain treatment. At the

eventually provides care, we include in our analysis whether any sort of permanent injury resulted from that delay in treatment.  See, e.g., Monmoth, 834 F.2d at 347 (finding that "the seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment."); Hill v. Dekalb Rg'l Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994) (holding that "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.");  Beyerbach v. Sears, 49 F.3d 1324 (8th Cir. 1995) (finding that no deliberate indifference to a serious injury occurred because plaintiff submitted no evidence to show that failing to provide treatment beyond ice and Tylenol for a broken hand for two hours and a delay of 17 hours in taking an x-ray had exacerbated the injury); Melendez v. Carroll, No. 04-193-SLR, 2006 WL 2244548 (D. Del. Aug. 4, 2006) (holding that prisoner showed no constitutional violation for a delay of treatment with painkillers for injuries from a beating because no permanent injury resulted).[8]  Since we have already determined

_____

same time, however, his inability to obtain treatment was not the result of a delay caused by the prison, but by another inmate.  If there had been any injury, we think that the prison's responsibility for the delay in treatment would be a question for the jury.

[8]We recognize that the clearest statement on the need to present medical evidence of medical harm caused by delay in treatment does not come from the Third Circuit, and thus that opinion is not controlling in the district.  We find, however, that the Monmouth decision's statement that we should consider the effects of a delay in care in determining when a medical need is serious compels us to determine that a delay that caused no injury means that plaintiff did not experience a serious medical need.  We think as well that basing a constitutional violation on a delay in treatment that caused no harm would be to put ourselves in the position of second-guessing (accurate) medical treatment in a way not

that no medical evidence exists to support plaintiff's claim that a permanent injury resulted from delays in his treatment, we agree with the defendant that the magistrate judge erred in finding plaintiff's earache amounted to a serious medical condition.  Plaintiff complained of his medical condition and did not receive immediate attention.  He received treatment within 60 hours, however, and no evidence exists that his condition was serious enough to cause permanent injury. The delay in treatment therefore caused no permanent damage and cannot be the basis for a constitutional violation.  The plaintiff thus cannot establish the first element of the Estelle test.  This finding disposes of the case, but in the interest of completeness we will address plaintiff's second objection to the report and recommendation.

**C.  The magistrate judge's finding that plaintiff's Eighth Amendment claim was insufficient to go to a jury without a finding of permanent hearing loss**

Plaintiff argues that the magistrate judge erred in finding that plaintiff was required to show that he had suffered a permanent injury from defendant's treatment in order to survive summary judgment.  The proper standard, plaintiff argues, is whether defendant was "deliberately indifferent" to plaintiff's medical condition in a way that caused him "unnecessary and wanton infliction of pain."  (Plaintiff's Objection to the Magistrate's Report and Recommendation (Doc. 185) at 1).

In the instant case, Magistrate Judge Blewitt found a serious medical need,

---

contemplated in the law.

but did not conclude that defendant acted with deliberate indifference.  Plaintiff's

objection appears to be with the legal standard the magistrate judge used to

determine that he suffered no injury to his constitutional rights.  He is undoubtedly

correct that "unnecessary and wanton infliction" of pain can be grounds for finding a

violation of a prisoner's constitutional rights.  See Estelle, 429 U.S. at 103).

Magistrate Judge Blewitt acknowledged this standard, but apparently found that

plaintiff's lack of a demonstrable injury meant that no such wantonness occurred.

We agree, as plaintiff has not offered evidence by which a jury could conclude that

he suffered any lasting pain from defendant's delay in providing him treatment.  See

Monmouth, 834 F.2d at 346 (finding that "[w]here prison authorities deny reasonable

requests for medical treatment, and such denial exposes the inmate 'to undue

suffering or the threat of tangible residual injury,' deliberate indifference is manifest.")

(quoting Westlake v. Lucas, 537 F.2d 857, 860 (3d Cir. 1976)).  In that sense,

plaintiff's objection should be overruled.

Because the plaintiff filed his objections *pro se*, however, we will read them

liberally, and infer that plaintiff intended to object to the magistrate judge's finding

that plaintiff suffered no deprivation of his constitutional rights, even though

Magistrate Judge Blewitt found that plaintiff's earache represented a "serious

medical condition" for which he did not receive immediate medical attention.  The

magistrate judge concluded that plaintiff had met one part of the test from Estelle.

He did not address whether the defendant was "deliberately indifferent" to this

serious medical need, however.  See Estelle, 429 U.S. at 104.  Our finding that no

serious medical need existed would dispose of the case, but we will nevertheless

address the issue of defendant's conduct.

In the medical context, courts have found "deliberate indifference" in a number

of different ways, "including where the prison official (1) knows of a prisoner's need

for medical treatment but intentionally refuses to provide it; (2) delays necessary

medical treatment based on a non-medical reason; or (3) prevents a prisoner from

receiving needed or recommended treatment."  Rouse v. Plantier, 182 F.3d 192, 197

(3d Cir. 1999).  The deliberate indifference test articulated in Estelle "affords

considerable latitude to prison medical authorities in the diagnosis and treatment of

the medical problems of inmate patients."  Inmates of Allegheny County Jail v.

Pierce, 612 F.2d 754, 762 (3d Cir. 1979).  Further, courts reject "'any attempt to

second-guess the propriety or adequacy of a particular course of treatment . . .

(which) remains a question of professional judgment.'"  Id. (quoting Bowring v.

Goodwin, 551 F.2d 44, 48 (4th Cir. 1977).  Still, only the "'unnecessary and wanton

infliction of pain' or deliberate indifference to the serious medical needs of prisoners,

are sufficiently egregious to rise to the level of a constitutional violation."  White v.

Napoleon, 897 F.2d 103, 108-09 (3d Cir. 1990) (quoting Estelle, 429 U.S. at 106)

(finding that prisoners whose complaint included (1) allegations that the doctor

intended to inflict pain on prisoners without any medical justification and (2) [a large]

number of specific instances in which the doctor allegedly insisted on continuing

course of treatment that the doctor knew were painful, ineffective or entailed

substantial risk of serious harm to the prisoners.").

Since we find that plaintiff suffered no harm from the delays in treatment, we

find that plaintiff did not suffer from unnecessary and wanton infliction of pain by

defendant's behavior.  There is also no evidence here that defendant denied or

delayed plaintiff's treatment without a valid reason, and merely sought to inflict pain

or punish the plaintiff.  See White, 897 F.2d at 111 (finding that when "the amended

complaint, fairly read, suggests that the doctor deliberately treated [plaintiff] with an

inappropriate drug for no valid reason" the plaintiff had stated a claim upon which

relief could be granted).  Defendant was a physician's assistant, in charge of

handing out medications to inmates on a Saturday evening.  Plaintiff's complaint is

apparently that defendant did not allow plaintiff to attend sick call and have his ear

examined.  As plaintiff admits, however, no "sick call" existed on Saturday evening or

any other date on the weekend at USP Allenwood (See Complt. at 4).  Plaintiff also

admits that he was offered access to sick call the following Monday morning, the first

time such treatment became available.  (Id.).  He contends he was unable to go to

sick call because his cell mate refused to comply with guard's orders to be

handcuffed.  (Deposition at 31-32).  Defendant cannot be said to have denied

plaintiff treatment for an invalid reason when plaintiff was offered the treatment he

demanded as soon as it was available.  The defendant likewise did not unreasonably

delay plaintiff's access to treatment.  Defendant was not a doctor and apparently

19

lacked the ability to order any immediate medical treatment; he could not offer plaintiff treatment that was unavailable.  Defendant could not, as plaintiff apparently insists, simply open the infirmary and start handing out drugs.  We will therefore, adopt the report and recommendation on this point.

## Conclusion

For the foregoing reasons, we adopt in part and reject in part the magistrate judge's report and recommendation in this case.  While we decline to adopt the magistrate judge's finding that plaintiff's earache constituted a serious medical condition, we adopt the Magistrate Judge's recommendation that summary judgment be granted to the defendant in this case.  An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHERWYN D. FREEMAN, JR.,** | : | **No. 3:04cv1546** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **CLEMENTE FRIMPONG,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this 15th day of February 2007:

1)  the Report and Recommendation (Doc. 166) is hereby **ADOPTED** to the extent that it grants summary judgment to the defendant;

2) the plaintiff's objections to the report and recommendation (Doc. 185) are hereby **DENIED**;

3) the defendant's objection to the report and recommendation (Doc. 190) is hereby **GRANTED**; and

4) the Clerk of Court is directed to close the case.

BY THE COURT:


s/ James M. Munley
**JUDGE JAMES M. MUNLEY**
**United States District Court**

21